**JENNER & BLOCK LLP**
Alexander M. Smith (SBN 295187)
asmith@jenner.com
Madeline P. Skitzki (SBN 318233)
mskitzki@jenner.com
515 South Flower Street, Suite 3300
Los Angeles, CA 90071
Telephone: (213) 239-5100
Facsimile: (213) 239-5199

**JENNER & BLOCK LLP**
Dean N. Panos (*pro hac vice*)
dpanos@jenner.com
353 North Clark Street
Chicago, IL 60654
Telephone: (312) 222-9350
Facsimile: (312) 527-0484

Attorneys for Defendant
Mondelēz International, Inc.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MEGAN WAGGENER VAN METER, individually, and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>   v.<br><br>MONDELĒZ INTERNATIONAL, INC.; and DOES 1-10,<br><br>        Defendants. | Case No. 3:24-cv-565-AMO<br><br>The Honorable Araceli Martínez-Olguín<br><br>**NOTICE OF MOTION AND MOTION TO DISMISS CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS & AUTHORITIES**<br><br>Courtroom: 10 (San Francisco)<br><br>Hearing Date: August 8, 2024<br><br>Hearing Time: 2:00 p.m. |

TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that, on August 8, 2024, at 2:00 p.m., or as soon thereafter as the Court is available, in Courtroom 10 of the federal courthouse located at 450 Golden Gate Avenue, San Francisco, CA 94102, Defendant Mondelēz International, Inc. ("MII") will, and hereby does, move to dismiss Plaintiff's Class Action Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim on which relief can be granted. In the alternative, MII moves to dismiss Plaintiff's claims premised on the labeling of products other than Gluten Free OREO cookies and Toblerone chocolate bars and her claims for injunctive relief pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of standing.

MII's Motion is based on this Notice of Motion and Motion, the concurrently filed Request for Judicial Notice and exhibits thereto, the following Memorandum of Points and Authorities, any additional briefing on this subject (including MII's reply brief), and the evidence and arguments that will be presented to the Court at the hearing on this matter.


Dated:    April 1, 2024                                     JENNER & BLOCK LLP

                                        By:    _____/s/__Dean N. Panos_____
                                                            Dean N. Panos

                                               Attorneys for Defendant
                                               Mondelēz International, Inc.

## **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................1

BACKGROUND .........................................................................................................................3

I.    Plaintiff's Complaint Describes "Widespread" Issues in the Cocoa Farming Sector. ...................3

II.   Plaintiff Seeks to Transform Her Generalized Concerns About the Cocoa Farming Sector Into a False Advertising Lawsuit. ...................................................4

ARGUMENT ...............................................................................................................................5

I.    Plaintiff's Generalized Allegations About the Cocoa Farming Sector Do Not Establish That the Cocoa in the Two Products She Purchased Was Farmed Using "Unsustainable" Means. ........................................6

II.   Plaintiff Has Not Plausibly Alleged That the Labeling Is Misleading or Deceptive. .....................9

    A.    "Sustainable" is an amorphous term that is unlikely to mislead reasonable consumers. ............................................10

    B.    The Cocoa Life and Rainforest Alliance seals on the labeling are also not misleading. ..............................................13

III.  Absent Any Plausible Claim of Deception, Plaintiff's Ancillary Claims Also Fail. ....................17

    A.    Plaintiff fails to state a plausible claim under the UCL's "unlawful" prong. ...................17

    B.    Plaintiff fails to state a plausible claim under the UCL's "unfair" prong. .........................20

    C.    Plaintiff fails to state a plausible claim for unjust enrichment. ..........................................20

IV.  Plaintiff Lacks Standing to Challenge Advertising She Did Not See or Rely On. ........................21

V.   Plaintiff Cannot Assert Her Claims on Behalf of a Nationwide Class. ........................................22

VI.  Plaintiff Lacks Standing to Seek Injunctive Relief. .......................................................................24

CONCLUSION ...........................................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abuelhawa v. Santa Clara Univ.*,
    529 F. Supp. 3d 1059 (N.D. Cal. 2021) ...............................................20

*Ahern v. Apple Inc.*,
    411 F. Supp. 3d 541 (N.D. Cal. 2019) ...........................................10, 20

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).....................................................................5, 8

*Barber v. Nestle USA, Inc.*,
    154 F. Supp. 3d 954 (C.D. Cal. 2015) .................................................16

*Barber v. Nestle USA, Inc.*,
    730 F. App'x 464 (9th Cir. 2018) .....................................................16

*Becerra v. Dr. Pepper/Seven Up, Inc.*,
    945 F.3d 1225 (9th Cir. 2019) ...........................................................9

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)......................................................................5

*Brodsky v. Apple Inc.*,
    445 F. Supp. 3d 110 (N.D. Cal. 2020) ............................................20, 21

*Brown v. Madison Reed, Inc.*,
    622 F. Supp. 3d 786 (N.D. Cal. 2022) .................................................10

*Bullard v. Jaguar Land Rover Auto, PLC*,
    No. 20-14464, 2023 WL 4845873 (D.N.J. July 28, 2023) .................................12

*Cafasso v. Gen. Dynamics C4 Sys., Inc.*,
    637 F.3d 1047 (9th Cir. 2011) ........................................................6, 22

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983)......................................................................24

*Clark v. Countrywide Home Loans, Inc.*,
    732 F. Supp. 2d 1038 (E.D. Cal. 2010)..................................................17

*Coastal Abstract Serv. v. First Am. Title Ins. Co.*,
    173 F.3d 725 (9th Cir. 1999) ...........................................................10

*Cohen v. Porsche Cars N. Am., Inc.*,
    No. 19-5530, 2019 WL 6700941 (C.D. Cal. Dec. 6, 2019)................................12

*Davidson v. Kimberly-Clark Corp.*,
 889 F.3d 956 (9th Cir. 2018) .................................................................................................24

*Davison v. Kia Motors Am., Inc.*,
 No. 15-239, 2015 WL 3970502 (C.D. Cal. June 29, 2015) .....................................................23

*De Havilland v. FX Networks, LLC*,
 21 Cal. App. 5th 845 (2018) ...................................................................................................20

*Dwyer v. Allbirds, Inc.*,
 598 F. Supp. 3d 137 (S.D.N.Y. 2022)..................................................................................7, 15

*Ehlers v. Ben & Jerry's Homemade Inc.*,
 No. 19-194, 2020 WL 2218858 (D. Vt. May 7, 2020) ...........................................................15

*Eidmann v. Walgreen Co.*,
 522 F. Supp. 3d 634 (N.D. Cal. 2021) .....................................................................................17

*Figy v. Frito-Lay N. Am., Inc.*,
 67 F. Supp. 3d 1075 (N.D. Cal. 2014) .....................................................................................23

*Frezza v. Google Inc.*,
 No. 12-237, 2013 WL 1736788 (N.D. Cal. Apr. 22, 2013).....................................................23

*Garcia v. Sony Computer Entm't Am., LLC*,
 859 F. Supp. 2d 1056 (N.D. Cal. 2012) ...................................................................................15

*Gordon v. Target Co.*,
 No. 20-9589, 2022 WL 836773 (S.D.N.Y. Mar. 18, 2022)......................................................8

*Granfield v. NVIDIA Corp.*,
 No. 11-5403, 2012 WL 2847575 (N.D. Cal. July 11, 2012) ...................................................21

*Gudgel v. Clorox Co.*,
 514 F. Supp. 3d 1177 (N.D. Cal. 2021) ...................................................................................20

*Hageman v. Hyundai Motor Am.*,
 No. 23-1045, 2024 WL 694378 (C.D. Cal. Jan. 5, 2024) .......................................................23

*Ham v. Hain Celestial Grp., Inc.*,
 70 F. Supp. 3d 1188 (N.D. Cal. 2014) .....................................................................................21

*Herceg v. Chobani, LLC.*,
 No. 22-5137, 2023 WL 6162939 (S.D.N.Y. Sept. 21, 2023) ...........................................13, 14

*Hill v. Roll Int'l Corp.*,
 195 Cal. App. 4th 1295 (2011) .............................................................................................9, 18

*In re iPhone Application Litig.*,
 6 F. Supp. 3d 1004 (N.D. Cal. 2013) .......................................................................................21

*Jackson v. Kraft Heinz Foods Co.*,
No. 21-5219, 2022 WL 4591749 (N.D. Ill. Aug. 3, 2022) ..........................................13, 14

*Kearns v. Ford Motor Co.*,
567 F.3d 1120 (9th Cir. 2009) .............................................................................................6

*Ketayi v. Health Enrollment Grp.*,
No. 20-1198, 2021 WL 2864481 (S.D. Cal. July 8, 2021) ................................................24

*Kwan v. SanMedica Int'l*,
854 F.3d 1088 (9th Cir. 2017) ..........................................................................................8, 9

*Kwikset Corp. v. Superior Court*,
51 Cal. 4th 310 (2011) ......................................................................................................21

*Lavie v. Procter & Gamble Co.*,
105 Cal. App. 4th 496 (2003) .............................................................................................9

*Lizama v. H&M Hennes & Mauritz LP*,
No. 22-1170, 2023 WL 3433957 (E.D. Mo. May 12, 2023) .............................................19

*Lorentzen v. Kroger Co.*,
532 F. Supp. 3d. 901 (C.D. Cal. 2021) ..............................................................................21

*Marder v. Lopez*,
450 F.3d 445 (9th Cir. 2006) ...............................................................................................3

*Mazza v. Am. Honda Motor Co.*,
666 F.3d 581 (9th Cir. 2012) .......................................................................................22, 23

*McCracken v. KSF Acquisition Corp.*,
No. 22-1666, 2022 WL 18932849 (C.D. Cal. Dec. 15, 2022) ..........................................21

*McGinity v. Procter & Gamble Co.*,
69 F.4th 1093 (9th Cir. 2023) .......................................................................................9, 14

*Moore v. Trader Joe's Co.*,
4 F.4th 874 (9th Cir. 2021) ...........................................................................................9, 14

*Myers v. Starbucks Corp.*,
No. 20-335, 2020 WL 13302437 (C.D. Cal. July 29, 2020)..........................13, 14, 15, 16

*N. Alaska Salmon Co. v. Pillsbury*,
174 Cal. 1 (1916) ...............................................................................................................23

*Nat'l Consumers League v. Wal-Mart Stores, Inc.*,
No. 15-7731, 2016 WL 4080541 (D.C. Super. July 22, 2016)..........................................17

*Pappas v. Chipotle Mexican Grill, Inc.*,
No. 16-612, 2016 WL 11703770 (N.D. Cal. Aug. 31, 2016) .......................................11, 21

*Pelayo v. Nestle USA, Inc.*,
  989 F. Supp. 2d 973 (C.D. Cal. 2013) .............................................................11

*Pistacchio v. Apple Inc.*,
  No. 20-7034, 2021 WL 949422 (N.D. Cal. Mar. 11, 2021) ...............................23

*Podpeskar v. Dannon Co.*,
  No. 16-8478, 2017 WL 6001845 (S.D.N.Y. Dec. 3, 2017) .........................7, 8, 11

*Punian v. Gillette Co.*,
  No. 14-5028, 2016 WL 1029607 (N.D. Cal. Mar. 15, 2016) ............................20

*Renn v. Otay Lakes Brewery, LLC*,
  No. 23-1139, 2024 WL 331616 (S.D. Cal. Jan. 29, 2024) ...............................25

*Ruiz v. Darigold, Inc./Nw. Dairy Ass'n*,
  No. 14-1283, 2014 WL 5599989 (W.D. Wash. Nov. 3, 2014) ...........................16

*Sinatro v. Barilla Am., Inc.*,
  635 F. Supp. 3d 858 (N.D. Cal. 2022) ............................................................25

*Southland Sod Farms v. Stover Seed Co.*,
  108 F.3d 1134 (9th Cir. 1997) .......................................................................10

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ......................................................................................21

*Sullivan v. Oracle Corp.*,
  51 Cal. 4th 1191 (2011) .................................................................................23

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ......................................................................................24

*Tabler v. Panera LLC*,
  No. 19-1646, 2019 WL 5579529 (N.D. Cal. Oct. 29, 2019) ............................22

*Tarzian v. Kraft Heinz Foods Co.*,
  No. 18-7148, 2019 WL 5064732 (N.D. Ill. Oct. 10, 2019) ................................8

*Thomas v. Costco Wholesale Corp.*,
  2022 WL 636637 (9th Cir. Mar. 4, 2022) ........................................................14

*TransUnion LLC v. Ramirez*,
  594 U.S.413 (2021) ......................................................................................24

*Vitt v. Apple Computer, Inc.*,
  469 F. App'x 605 (9th Cir. 2012) ...................................................................10

*Walcoff v. Innofoods USA, Inc.*,
  No. 22-1485, 2023 WL 3262940 (S.D. Cal. May 4, 2023) ...............................20

*Walker v. Nestle USA, Inc.*,
  No. 19-723, 2022 WL 901553 (S.D. Cal. Mar. 28, 2022) ....................................................14

*Warner v. Tinder Inc.*,
  105 F. Supp. 3d 1083 (C.D. Cal. 2015) .................................................................................17, 23

*Weiss v. Trader Joe's Co.*,
  838 F. App'x 302 (9th Cir. 2021) ..........................................................................................14

*Weiss v. Trader Joe's Co.*,
  No. 18-1130, 2018 WL 6340758 (C.D. Cal. Nov. 20, 2018) ...........................................14

*Wilson v. Frito-Lay N. Am., Inc.*,
  961 F. Supp. 2d 1134 (N.D. Cal. 2013) ...............................................................................23, 24

**Statutes**

Cal. Bus. & Prof. Code §§ 17200 *et seq.* ...................................................................5, 17, 18, 20

Cal. Bus. & Prof. Code §§ 17580 *et seq.* ................................................................................17

Cal. Civ. Code §§ 1750 *et seq.* ................................................................................. *passim*

**Court Rules**

Fed. R. Civ. P.  9 ....................................................................................................................6, 22

**Other Authorities**

16 C.F.R. §§ 260.1 *et seq.* .........................................................................................12, 17, 18, 19

FTC, *Guides for the Use of Environmental Marketing Claims*,
  75 Fed. Reg. 63552 (Oct. 15, 2010) ..................................................................................11, 12

# INTRODUCTION

This is not a case about "child labor" or "environmental degradation." It is about a consumer who alleges that she paid an unfair "price premium" for two chocolate-flavored treats: Gluten Free OREO cookies and Toblerone chocolate bars. Plaintiff does not allege that the two products she purchased were defective in any way. Instead, Plaintiff alleges that the entire cocoa sector in Ghana and the Ivory Coast—where Mondelēz International, Inc. ("MII")[1] allegedly procures cocoa for use in the products at issue—frequently uses child labor and environmentally destructive farming practices. Despite her choice to focus this lawsuit on MII, Plaintiff alleges that these practices are "widespread" and "ubiquitous" throughout the cocoa farming sector. Compl. ¶¶ 13, 16. And Plaintiff does not allege that MII owns or controls any of the farms from which it allegedly procures its cocoa or that it personally employs child laborers. To the contrary, Plaintiff admits that MII procures cocoa through "intermediaries" and that MII "has no way of knowing whether child labor was involved in the production of most of its cocoa." *Id.* ¶¶ 14, 22.

Plaintiff nonetheless claims that she interpreted various label statements—including the phrase "100% Sustainably Sourced Cocoa," as well as logos highlighting MII's "Cocoa Life" program and its certification by the Rainforest Alliance—to suggest that MII's supply chain is completely free of the labor and environmental issues alleged in the Complaint. Based on that alleged expectation, Plaintiff now seeks to recover the so-called "price premium" that she and other consumers allegedly paid due to the use of these purported "false sustainability claims." This Court should reject Plaintiff's effort to transform complex, multifaceted, and transnational issues in the entire cocoa sector into a false advertising lawsuit.

Plaintiff's claims of deception fail because they are based on generalized allegations about the cocoa farming sector in West Africa, rather than MII's specific conduct. Plaintiff cannot plausibly trace the provenance of the cocoa beans used in the two products she (or any class member) purchased to any specific cocoa farm—let alone allege that those cocoa beans were farmed using specific environmental or labor practices. Nor can Plaintiff lay the blame for the cocoa sector's alleged failure to eradicate these practices at MII's feet. Courts around the country have dismissed lawsuits that seek to hold individual

---

[1] MII is a global holding company and the parent company of Mondelēz Global LLC ("MDLZ"), which manufactures, labels, markets, and distributes the products at issue in the United States. MII is the entity with primary responsibility for the "Cocoa Life" program and the procurement of cocoa for use in products sold by its many brands across the world.

companies liable based on broad allegations about industry-wide practices. This Court should similarly reject Plaintiff's effort to hold MII liable for the alleged shortcomings of the entire cocoa sector.

Plaintiff attempts to avoid this result by framing this case as a garden-variety false advertising lawsuit challenging labeling claims on various products made with chocolate. But that effort fails because none of the labeling is likely to mislead reasonable consumers. To the extent Plaintiff challenges the use of the "Cocoa Life" and Rainforest Alliance seals on the labels, that theory fails because those seals truthfully highlight MII's participation in its Cocoa Life initiative and the product's certification by the Rainforest Alliance. And to the extent Plaintiff challenges the representation that certain products are manufactured with "100% Sustainably Sourced Cocoa," that theory fails because Plaintiff does not allege (and cannot plausibly allege) that reasonable consumers share a concrete, objective definition of "sustainability." Indeed, Plaintiff's use of this term to encompass a wide variety of "environmental and social benefits" illustrates that "sustainability" is an amorphous concept that cannot support a claim of consumer deception. Moreover, if a reasonable consumer had questions about what MII means by "sustainability," that consumer could find the answers on MII's Cocoa Life website, which is prominently displayed on the products' back label and which details the extensive steps MII has taken since 2012 to address the complex issues facing the cocoa sector. That information resolves any purported ambiguity arising from the labeling and defeats Plaintiff's claims of deception.

Finally, Plaintiff's lawsuit is overbroad in multiple respects. Plaintiff's purchase of two specific products does not entitle her to challenge the labeling of other products she did not purchase—let alone statements on the Cocoa Life website, MII's Employee Code of Conduct, or MII's Supplier Code of Conduct, which Plaintiff does not allege she saw or relied on prior to buying the two products she allegedly purchased. Nor can Plaintiff assert claims against MII (which is not a California citizen) on behalf of a putative nationwide class whose alleged purchases have no nexus to California. And because Plaintiff's allegations make clear that she is unwilling to purchase the products at issue in the future unless MII changes its cocoa sourcing practices, she cannot plausibly allege that an injunction requiring MII to change the products' *labeling* will have any effect on her willingness to purchase those products. Plaintiff thus lacks standing to seek an injunction forcing MII to change the products' labeling, and this Court should dismiss her claims to the extent they seek injunctive relief.

**BACKGROUND**

**I.      Plaintiff's Complaint Describes "Widespread" Issues in the Cocoa Farming Sector.**

Plaintiff alleges that "[c]hild labor and environmental degradation" are "widespread" throughout the cocoa farming sector.  Compl. ¶ 13; *see also id.* ¶ 16 (alleging that "child and slave labor" are "ubiquitous" in the Ivory Coast).  According to Plaintiff, approximately 2 million cocoa farmers grow cocoa on "small farms" and sell their cocoa to various "intermediaries," such as "cooperatives" or "middlemen."  *Id.* ¶ 13–14.  These "intermediaries" sell cocoa to "grinders or traders," who in turn sell the cocoa to buyers such as MII.  *Id.*  ¶ 14.  Plaintiff alleges that "[t]he disparity in market power between . . . disperse and small cocoa farmers and multinational chocolate corporations has led to these cocoa farmers being grossly underpaid"—which, in turn, has allegedly forced these farmers "to resort to cheap child or slave labor."  *Id.* ¶ 15.  She also alleges that "the market created by the chocolate industry has been the primary source for the destruction of environmentally protected areas" in West Africa.  *Id.* ¶ 34.

MII takes these concerns about the cocoa farming sector seriously.  To that end, MII participates in at least two initiatives designed to address the alleged use of child and forced labor in the cocoa supply chain and to help minimize the effect of cocoa production on the environment:

First, MII has created the "Cocoa Life" program, which aims to "accelerate positive impact and help drive sector transformation" and "work[s] to help prevent and combat the risk of child labor."  Compl. ¶ 20; *see also* RJN Ex. 1 (Cocoa Life website).[2]  While Plaintiff alleges that these goals are "false assurances" (Compl. ¶ 20), she does not and cannot dispute that MII has invested over $400 million into this initiative since 2012, that it sourced 80% of its cocoa volume for its chocolate brands through the Cocoa Life program as of the end of 2022, and that it has publicly stated that its goal is to "source cocoa for all of Mondelēz International's chocolate brands from Cocoa Life by 2025."  RJN Ex. 1.  And while Plaintiff claims that the Cocoa Life program has not "end[ed] the system of child labor" in the cocoa farming sector (Compl. ¶ 59), MII has never claimed that these complex problems have a simple solution.

---

[2] Plaintiff cites the Cocoa Life website throughout her Complaint.  *See, e.g.*, Compl. ¶¶ 19 n.15, 20 n.16, 58 n.54.  Plaintiff's Complaint also depicts the packaging of one of the products at issue, which instructs the consumer to visit that website for more information regarding the Cocoa Life Program.  *See id.* ¶ 62.  These materials are thus "incorporated by reference," and this Court can consider their contents in ruling on this motion to dismiss.  *See generally Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006).

Rather, MII "recognize[s]" on its Cocoa Life website that "change takes time," but that it is nonetheless "committed to [its] holistic approach to grow opportunities for [its] cocoa communities."  RJN Ex. 1.

<u>Second</u>, MII participates in the Rainforest Alliance program, which "support[s] companies' responsible sourcing commitments both beyond and in line with certification."  RJN Ex. 2; *see also* Compl. ¶ 43 (challenging the use of "third-party certifications, such as the Rainforest Certification," on some of the product labels).  Plaintiff does not (and cannot) dispute that the Rainforest Alliance—a third-party credentialing organization—has permitted MII to label the products at issue with the Rainforest Alliance seal.  Instead, Plaintiff alleges that the Rainforest Alliance's stated commitment to addressing child labor is an "empty promise" because an unspecified number of "Rainforest certified farms have been found to use child labor despite the certification."  *Id.* ¶ 44.

## II. Plaintiff Seeks to Transform Her Generalized Concerns About the Cocoa Farming Sector Into a False Advertising Lawsuit.

Plaintiff is a California consumer who allegedly purchased Gluten Free OREO cookies, Toblerone chocolate bars, and unspecified other "products that bore the Cocoa Life seal and other false sustainability claims" from Safeway stores in Alameda County.  Compl. ¶ 62.  The front labels of the two products Plaintiff identified in her complaint contain only two of the representations at issue in this lawsuit:  (1) the Cocoa Life seal, which appears on both Gluten Free OREO cookies and Toblerone bars; (2) the phrase "Made With 100% Sustainably sourced Cocoa," which appears on the front label of Gluten Free OREO cookies immediately above the Cocoa Life seal.  *See id.* (images of labeling).[3]  Plaintiff does not allege that she purchased any other products manufactured or sold by MII or MDLZ, including several products whose labeling she discusses in her complaint.  *See, e.g.*, *id.* ¶ 41 (labeling of OREO cookies); *id.* ¶ 43 (labeling of Chocolate Brownie Clif Bars bearing the Rainforest Alliance seal on the side panel).  Nor does she allege that she reviewed any other materials—including the Cocoa Life website, MII's Supplier Code of Conduct, or MII's Employee Code of Conduct—before making her alleged purchases.

---

[3] The back label of Gluten Free OREO cookies also contains the following text: "At OREO, we're all about the good stuf [sic].  Through our partnership with Cocoa Life, we help support sustainable cocoa sourcing[.]  Cocoa Life works together with farmers to grow cocoa in ways that help protect people & planet[.]  For more information visit cocoalife.org[.]"  *See* Compl. ¶ 62.

Plaintiff does not allege that the two products she purchased were defective in any way. Instead, she alleges that their labeling includes "misrepresentations about the social and environmental benefits of the products." *Id.* ¶ 63. Plaintiff alleges that she "saw and relied upon" these alleged misrepresentations "in making her decision to buy the products." *Id.* ¶ 63. She claims that she "suffered injury in that she would not have bought the . . . products had she known the products were not sourced from sustainable farming practices but rather off the backs of child and slave labor." *Id.* ¶ 64. And she alleges that these representations also injured other consumers by inducing them to "buy[] products that they would not have purchased" or to "pay[] an excessive premium price" for those products. *Id.* ¶ 103.

Based on that theory of deception and injury, Plaintiff asserts claims under the Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750 *et seq.*, and the Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.*, as well as a common-law claim for unjust enrichment. *See* Compl. ¶¶ 77–116. Critically, Plaintiff does not assert these claims only on behalf of consumers who purchased the two products she did. Nor does she assert her claims only on behalf of consumers in California. Instead, she asserts these claims on behalf of "[a]ll United States residents who purchased Mondelez Products marked with the 'Cocoa Life' seal, 'sustainably sourced,' '100% sustainable,' 'improv[ing] the lives of farmers,' or any other false sustainability claims within the United States" during the putative class period. *Id.* ¶ 65 (second alteration in original). She seeks an array of remedies on behalf of this putative class, including a variety of monetary remedies (such as damages, restitution, and disgorgement) and an injunction forbidding MII from using claims suggesting that the products "support sustainable farming or provide other general environmental and social benefits." *Id.* at 27–29 (Prayer for Relief).

## ARGUMENT

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facts indicating the "mere *possibility* of misconduct" fall short of meeting this plausibility standard. *Id.* at 679 (emphasis added). Rather, the plaintiff must "allege more by way of factual content to 'nudg[e]' his claim" of unlawful action "across the line from conceivable to plausible." *Id.* at 683 (quoting *Twombly*, 550 U.S. at 570).

Furthermore, because all of Plaintiff's claims are based on alleged "affirmative misrepresentations on Mondelez's product packaging" (Compl. ¶ 4), they are subject to Rule 9(b)'s heightened pleading standard. *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) (holding that Rule 9(b) applies to state-law claims that "allege a unified course of fraudulent conduct," whether or not fraud is a necessary element of those claims). Rule 9(b) requires Plaintiffs to "state with particularity the circumstances constituting fraud"—or, in other words, to identify "the who, what, where, when, and how of the misconduct charged, as well as what is false or misleading about [the purportedly fraudulent] statement, and *why it is false*." *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054-55 (9th Cir. 2011) (alteration in original) (internal quotations and citations omitted) (emphasis added).

Here, the crux of Plaintiff's lawsuit is that MII's portfolio of chocolate and biscuit products are mislabeled with a variety of "false sustainability claims." Compl. ¶¶ 63, 65. But Plaintiff's claims fail—not only because her claims rest on generalized allegations about the cocoa farming sector, but also because she has not plausibly alleged that these allegedly "false sustainability claims" are likely to mislead reasonable consumers. And even if this Court allows this lawsuit to proceed, many aspects of Plaintiff's complaint—including her attempt to assert claims based on representations she never saw, her efforts to assert claims on behalf of a putative nationwide class, and her demand for injunctive relief—suffer from independent defects that require their dismissal.

## I. Plaintiff's Generalized Allegations About the Cocoa Farming Sector Do Not Establish That the Cocoa in the Two Products She Purchased Was Farmed Using "Unsustainable" Means.

Although this lawsuit implicates products sold under MII's brands, few of Plaintiff's allegations specifically concern MII's conduct. To the contrary, most of Plaintiff's allegations implicate broad, sector-wide concerns about cocoa farming in West Africa. For example, Plaintiff alleges that "[c]hild labor and environmental degradation in the Côte D'Ivoire are well-known and undisputed by Mondelez" and that the "problem is so widespread due, in part, to the nature of Cocoa farms." Compl. ¶ 13. According to Plaintiff, "[t]he disparity in market power between . . . disperse and small cocoa farmers and multinational chocolate corporations has led to those cocoa farmers being grossly underpaid." *Id.* ¶ 15. And Plaintiff similarly alleges that "the market created by the chocolate industry" has been "the primary source for the destruction of environmentally protected areas" in West Africa and elsewhere. *Id.* ¶ 34.

But while Plaintiff alleges that MII "is one of the [] largest snack food and chocolate companies in the world" (*id.* ¶ 1), she does not allege that MII played any distinct role in the alleged perpetuation of these sector-wide practices. Similarly, while Plaintiff alleges in general terms that the cocoa in MII's products is "not sourced from sustainable farming practices but rather off the backs of child and slave labor" (*id.* ¶ 64), she pleads no facts tying the cocoa in the two products she allegedly purchased to specific cocoa plantations that allegedly used slave labor, child labor, or problematic farming practices. Nor could she, as her own allegations establish that MII does not purchase cocoa directly from farmers and does not employ those farmers itself—which means it cannot control those farmers' conditions of employment or the farming practices they utilize. *See id.* ¶ 14 (alleging that MII purchases cocoa through "intermediaries"). Indeed, Plaintiff openly concedes that MII "has no way of knowing whether child labor was involved in the production of most of its cocoa." *Id.* ¶ 22.

Faced with similar lawsuits, courts around the country have held that plaintiffs cannot rely on allegations about industry-wide practices to substantiate their claims that a specific defendant (such as MII) mislabels specific products. For example, in *Dwyer v. Allbirds, Inc.*, the plaintiff alleged that an online shoe manufacturer advertised its products with purportedly "misleading animal welfare claims," such as "Our Sheep Live the Good Life." 598 F. Supp. 3d 137, 146 (S.D.N.Y. 2022). The plaintiff alleged that these representations were misleading because "economic realities dictate—and require—that all sheep bred for wool are also slaughtered and sold for their meat." *Id.* (alterations and internal quotation marks omitted). The court dismissed the lawsuit and found these allegations about "the sheep industry and wool harvesting practices as a whole" insufficient to state a plausible claim. *Id.* at 152.

In so holding, the court observed that the "underlying evidence on which Plaintiff relies . . . does not describe any animal cruelty specific to Defendant or its products." *Id.* The court reasoned that the plaintiff's "allegations that the wool industry as a whole deceives consumers" were not sufficient to "satisfy Plaintiff's burden to establish that a specific advertisement or statement by Defendant would mislead a reasonable consumer." *Id.* (citation, alteration, and internal quotation marks omitted).

Similarly, in *Podpeskar v. Dannon Co.*, the plaintiff alleged that Dannon mislabeled its yogurt products as "All Natural," even though they allegedly "contained ingredients derived from animals fed GMO crops, subjected to non-natural processes used to increase milk yield, or given hormones . . . or

antibiotics." No. 16-8478, 2017 WL 6001845, at *1 (S.D.N.Y. Dec. 3, 2017). The plaintiff attempted to bolster this allegation by "recit[ing] facts and statistics about the use of GMOs and animal husbandry practices more generally" in the U.S. agricultural industry. *Id.* at *2. The court dismissed her lawsuit.

As the court explained, the "nub of plaintiff's claim is simply that yogurt is made from milk, and that—today—most milk is made from cows that consume feed of a particular type, and who are subjected to certain animal husbandry practices." *Id.* at *4. But absent any allegation about "Dannon's specific practices," the court found that this "speculation" did not satisfy "*Twombly*'s insistence that claims be nudged over the line from conceivable to plausible." *Id.*

That reasoning applies with equal force here. Plaintiff cannot plausibly allege that the cocoa in the two products she purchased was farmed in a specific location, that it was harvested by children, that it was farmed using environmentally harmful practices, or that the farmers who harvested it were not paid a fair wage. That is why Plaintiff relies on sweeping allegations about labor and environmental practices that are supposedly "widespread" throughout the cocoa farming sector. Compl. ¶ 13. But those allegations are insufficient to "draw a connection between the common industry practice and the actual practice" used to procure the cocoa in the two products Plaintiff purchased. *Tarzian v. Kraft Heinz Foods Co.*, No. 18-7148, 2019 WL 5064732, at *4 (N.D. Ill. Oct. 10, 2019).

Plaintiff asserts that MII, as a "multi-billion dollar, multi-national company, could end the system of child labor if [it] wanted to." Compl. ¶ 59. But that allegation defies common sense, which this Court must apply in assessing the plausibility of Plaintiff's claims. *Iqbal*, 556 U.S. at 679. No single company could single-handedly fix the allegedly "ubiquitous" and "widespread" issues that Plaintiff attributes to the cocoa farming sector, which are multi-faceted and require coordination among many stakeholders (including foreign governments). Compl. ¶¶ 13, 16. And Plaintiff does not even attempt to allege that MII is solely responsible for causing these issues in the first instance. Because none of Plaintiff's allegations are "specific to" MII, she cannot hold it liable based on her complaints about the "industry as a whole." *Gordon v. Target Co.*, No. 20-9589, 2022 WL 836773, at *10 (S.D.N.Y. Mar. 18, 2022).

Plaintiff similarly misses the mark when she alleges that MII "cannot substantiate its claims to use 'sustainably sourced cocoa.'" Compl. ¶ 50. That allegation ignores the Ninth Circuit's admonition that "private plaintiffs" lack "the power to require defendants to substantiate their advertising claims." *Kwan*

*v. SanMedica Int'l*, 854 F.3d 1088, 1095–96, 1098 (9th Cir. 2017) (affirming dismissal of UCL and CLRA claims where the plaintiff "failed to allege facts that would support a finding that defendant's marketing claims were actually false"). For that reason, Plaintiff "bear[s] the burden of proving" that the cocoa in the two products she purchased came from cocoa farms that use allegedly "unsustainable practices," which is the factual premise of her allegation that MII's "marketing claims are false and misleading." *Id.* Plaintiff's inability to carry this burden warrants the dismissal of her lawsuit.

## II.    Plaintiff Has Not Plausibly Alleged That the Labeling Is Misleading or Deceptive.

Although her lawsuit relies heavily on background allegations about the cocoa farming sector in general, Plaintiff attempts to tie those allegations to alleged "misrepresentations about the social and environmental benefits of the products." Compl. ¶ 63. To that end, her lawsuit challenges a wide variety of allegedly "false sustainability claims," including the Cocoa Life seal, the phrase "sustainably sourced," and the phrase "100% sustainable." *Id.* ¶ 65. But these claims also fail, as Plaintiff has not plausibly alleged "that members of the public are *likely* to be deceived" by the products' labeling. *Becerra v. Dr. Pepper/Seven Up, Inc.*, 945 F.3d 1225, 1228 (9th Cir. 2019) (emphasis added) (citation omitted) (applying this standard to affirm the dismissal of "claims under the California consumer-protection statutes").

The "reasonable consumer" standard "requires more than a mere possibility" that the labeling "'might conceivably be misunderstood by some few consumers viewing it in an unreasonable manner.'" *Id.* (quoting *Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496, 508 (2003)). The standard is not that of a "least sophisticated consumer" or an "unwary consumer." *Hill v. Roll Int'l Corp.*, 195 Cal. App. 4th 1295, 1304 (2011) (citation and emphasis omitted). "Rather, the reasonable consumer standard requires a *probability* that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Becerra*, 945 F.3d at 1228–29 (emphasis added) (citation and internal quotation marks omitted). And even if a labeling claim is arguably misleading when viewed in a linguistic vacuum, it is not actionable if "other available information" about the product would eliminate any alleged deception. *Moore v. Trader Joe's Co.*, 4 F.4th 874, 882 (9th Cir. 2021); *see also McGinity v. Procter & Gamble Co.*, 69 F.4th 1093, 1098–99 (9th Cir. 2023) (holding that an "ambiguous" labeling claim is not actionable when "the ambiguity can be resolved by reference to the back label").

1  Plaintiff's claims of deception focus on two aspects of the labeling: (1) the use of the terms

2  "sustainable" or "sustainably"; and (2) the use of the Cocoa Life seal and other seals, such as the Rainforest

3  Alliance seal.  But these representations do not support a plausible claim of deception.  To the contrary,

4  Plaintiff's conflicting and inconsistent definitions of "sustainability" underscore that this term lacks any

5  consistent, objective definition—which means it cannot give rise to a claim of consumer fraud.  To the

6  extent Plaintiff challenges the Cocoa Life or Rainforest Alliance seals, those claims also fail, as these seals

7  simply reflect MII's participation in these programs and its commitment to their aspirational goals.

8  **A.  "Sustainable" is an amorphous term that is unlikely to mislead reasonable consumers.**

9  Plaintiff challenges two sets of "sustainability" representations: (1) the phrase "100% Sustainably

10  Sourced Cocoa"; and (2) the representation "that [MII] helps 'support sustainable cocoa sourcing.'"

11  Compl. ¶ 41; *see also id.* ¶ 62 (challenging the representation that "through our partnership with Cocoa

12  Life we help support sustainable farming").  But because the term "sustainable" lacks any objective or

13  widely-shared meaning, Plaintiff cannot plausibly allege that these representations are misleading.

14  "[T]o be actionable as an affirmative misrepresentation, a statement must make a 'specific and

15  measurable claim, capable of being proved false or of being reasonably interpreted as a statement of

16  objective fact.'"  *Vitt v. Apple Computer, Inc.*, 469 F. App'x 605, 607 (9th Cir. 2012) (quoting *Coastal

17  Abstract Serv. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999)).  In contrast, statements that

18  "are not factual representations that a given standard is met" or that "do not say anything about specific

19  characteristics or components" of a product constitute non-actionable puffery.  *Ahern v. Apple Inc.*, 411

20  F. Supp. 3d 541, 556 (N.D. Cal. 2019) (citation omitted);  *see also, e.g.*, *Southland Sod Farms v. Stover

21  Seed Co.*, 108 F.3d 1134, 1145 (9th Cir. 1997) (noting that "product superiority claims that are vague or

22  highly subjective often amount to nonactionable puffery"); *Brown v. Madison Reed, Inc.*, 622 F. Supp. 3d

23  786, 802 (N.D. Cal. 2022) (holding that challenged statements were puffery when they "ma[de] no factual

24  representations" and were instead "vague, generalized, and subjective statements about the products").

25  Here too, none of the "false sustainability representations" Plaintiff challenges—including the

26  term "sustainable" itself—are "specific and measurable claim[s]" that are "capable of being proved false."

27  *Vitt*, 469 F. App'x at 607.  In contrast to a claim that a chocolate bar has "100 calories" or "85% cacao,"

28  there is no objective benchmark by which one can determine whether a product is "sustainable" or

1    "sustainably sourced."  Indeed, when the FTC revised the Green Guides in 2010, it specifically found that

2    the term "sustainable" has "no single environmental meaning to a significant number of consumers."  FTC,

3    *Guides for the Use of Environmental Marketing Claims*, 75 Fed. Reg. 63552, 63583 (Oct. 15, 2010).

4    "[G]iven the wide range of meanings of 'sustainable,'" the FTC found in 2012 that it "lack[ed] a basis" to

5    provide guidance about how marketers should use this term.  *See* RJN Ex. 3, at 257–58.  That defeats any

6    challenge to the "sustainability" representations, as Plaintiff cannot plausibly allege that a term is

7    misleading if she cannot provide a "plausible objective definition" of that term or plausibly allege that

8    "reasonable consumers would share her interpretation."  *Pappas v. Chipotle Mexican Grill, Inc.*, No. 16-

9    612, 2016 WL 11703770, at *7 (N.D. Cal. Aug. 31, 2016) (dismissing lawsuit where the plaintiff "failed

10   to allege a plausible objective definition of the term 'non-GMO' that would deceive reasonable consumers

11   in this context"); *see also, e.g.*, *Podpeskar*, 2017 WL 6001845, at *4 (dismissing lawsuit challenging

12   "natural" labeling because the plaintiff's definition of "natural" was based on "her own feelings").

13       *Pelayo v. Nestle USA, Inc.*, 989 F. Supp. 2d 973 (C.D. Cal. 2013), is instructive.  There, the plaintiff

14   asserted that the defendant mislabeled its Buitoni pastas as "All Natural" and asserted claims under the

15   UCL and CLRA premised on this theory.  *Id.* at 975–76.  The court dismissed her lawsuit.  In so holding,

16   the court found that the plaintiff "fail[ed] to offer an objective or plausible definition of the phrase 'All

17   Natural'" and that her own complaint "offer[ed] several conflicting definitions of the term."  *Id.* at 978.

18   The court also noted that the FTC had "declined to adopt a definition" of the term "natural," which "may

19   be used in numerous contexts and may convey different meanings depending on that context."  *Id.* at 979

20   (citation and internal quotation marks omitted).  "Given the FTC's findings that the term 'natural' can be

21   used in numerous contexts," the court found it "implausible that a significant portion of the general

22   consuming public or of targeted consumers would be deceived . . . by the use of the term 'All Natural' on

23   the Buitoni Pastas."  *Id.* at 979–80 (citation and internal quotation marks omitted).

24       That reasoning applies with equal force here.  Plaintiff does not articulate a "plausible objective

25   definition" of the term "sustainable," and her allegations do not establish that "reasonable consumers

26   would share her interpretation" of this term.  *Pappas*, 2016 WL 11703770, at *7.  Moreover, like the

27   plaintiff in *Pelayo*, Plaintiff provides "several conflicting definitions" of the term "sustainable."  989 F.

28   Supp. 2d at 978.  At one point in her complaint, she alleges that the term "sustainability" "*generally*

*connotes* a combination of environmental, social, and ethical concerns." Compl. ¶ 48 (emphasis added). Yet she relies extensively on the Green Guides—in which the FTC provided guidance on the use of "environmental claims" (16 C.F.R. § 260.1) and intentionally *declined* to provide guidance about the term "sustainable" because it has "no single environmental meaning." 75 Fed. Reg. at 63583.

Plaintiff also cites several companies' definitions of "sustainability"—all of which are different. *See* Compl. ¶ 48. For example, Unilever defines "sustainability" to encompass concerns about "inequality" and "social exclusion." *See* RJN Ex. 4 (Unilever webpage cited in footnote 44 of the complaint). PepsiCo defines "sustainability" to include "human rights," "labor," "environmental management," and "conservation of natural resources." *See* RJN Ex. 5 (PepsiCo website cited in footnote 45 of the complaint). And while the Barry Callebaut website Plaintiff cites does not actually *define* the term "sustainable," it notes that its "Supplier Code details [its] expectations toward suppliers with regards to compliance with laws and regulations, human rights as well as environmental impact." RJN Ex. 6 (Barry Callebaut website cited in footnote 46 of the complaint).[4] These varying definitions confirm that there is no uniform, consistent, or objective definition of "sustainability"—which means that this is not a term that can give rise to a plausible consumer fraud claim.

For that reason, courts around the country have dismissed claims premised on "vague statements" about "sustainability." *Bullard v. Jaguar Land Rover Auto, PLC*, No. 20-14464, 2023 WL 4845873, at *14 (D.N.J. July 28, 2023); *see also, e.g., Cohen v. Porsche Cars N. Am., Inc.*, No. 19-5530, 2019 WL 6700941, at *3 (C.D. Cal. Dec. 6, 2019) (finding that representation about "quality and sustainability" was "puffery" and could not "provide the basis for a false advertising claim"); RJN Ex. 7 (order in *Organic Consumers Ass'n v. Bigelow Tea Co.* (D.C. Super.) (dismissing consumer fraud lawsuit challenging labeling of tea as "environmentally friendly" and "sustainable" where the plaintiff did not "give any facts regarding consumer belief or cite to any consumer survey that could render this claim more than a non-actionable opinion"). Here too, Plaintiff has not alleged any facts that suggest that "sustainability" has a

---

[4] Tellingly, Plaintiff does *not* cite MII's definition of "sustainably sourced cocoa," even though this definition was available on the Cocoa Life website at the time of Plaintiff's purchase and differs from the Unilever, PepsiCo, and Barry Callebaut definitions Plaintiff cites in her complaint. *See* RJN Ex. 1 ("[W]hen we talk about sustainable sourcing, we are referring to growing cocoa in ways that protects the people that grow it and the planet around us, whilst enabling farmers to prosper.").

1    concrete, objective, or widely-shared meaning among consumers.   As a result, the challenged

2    representations about "sustainability" cannot support a plausible claim of deception.

3          **B.      The Cocoa Life and Rainforest Alliance seals on the labeling are also not misleading.**

4          Plaintiff also challenges the use of the Cocoa Life and Rainforest Alliance seals on the products'

5    labeling.  But these aspects of the labeling are also not misleading, as they truthfully reflect MII's creation

6    and participation in the Cocoa Life program and its receipt of a third-party certification by the Rainforest

7    Alliance.  To the extent these seals communicate any message about MII's commitment to sustainability,

8    that broad and aspirational message is not remotely deceptive.

9          Many courts have held that it is not misleading for a manufacturer to highlight the fact that a third

10   party has certified or endorsed the product.  *See, e.g.*, *Herceg v. Chobani, LLC.*, No. 22-5137, 2023 WL

11   6162939, at *6 (S.D.N.Y. Sept. 21, 2023) (dismissing lawsuit challenging the use of the "Fair Trade USA

12   Certified" seal where the plaintiff did not "allege[] that Defendant [did] not meet the standards of Fair

13   Trade USA"); *Jackson v. Kraft Heinz Foods Co.*, No. 21-5219, 2022 WL 4591749, at *4 (N.D. Ill. Aug.

14   3, 2022) (holding that the use of the "REAL" dairy seal on frozen pizza bagels was not misleading and

15   noting that the National Milk Producer Federation, "which vets and authorizes third-party use of its REAL

16   Seal trademark, would have something to say" if the defendant was not authorized to use this seal).

17   Indeed, one California district court has dismissed virtually identical claims challenging the use of the

18   "Cocoa Horizons" and Rainforest Alliance certifications where the plaintiffs alleged the defendants could

19   not "guarantee that their cocoa suppliers did not engage in deplorable environmental and labor practices."

20   *Myers v. Starbucks Corp.*, No. 20-335, 2020 WL 13302437, at *2, 4–5 (C.D. Cal. July 29, 2020).

21          *Myers* is directly on point.  There, as here, the plaintiff alleged that Mars mislabeled its Dove dark

22   chocolate bars with the Rainforest Alliance seal and the phrase "We buy cocoa from Rainforest Alliance

23   Certified™ farms, traceable from the farms into our factory."  *Id.* at *5.  The court found that these

24   representations were not misleading.  In so holding, the court noted that the plaintiff did "not dispute that

25   Mars 'buy[s]' cocoa from Rainforest Alliance Certified farms'" and emphasized that "Mars's packaging

26   simply does not make any claims about the labor practices of its suppliers or the scope of the Rainforest

27   Alliance program."  *Id.*  The court applied the same reasoning in dismissing the plaintiff's claims against

28   Quaker, which stated on the labeling of its Chocolate Chip Chewy Bars that it "[s]upports sustainably

sourced cocoa through Cocoa Horizons." *Id.* at *4. Because the plaintiff "concede[d] that Quaker does, in fact, partner with Cocoa Horizons and that Cocoa Horizons works to promote sustainable and ethical practices," the court found that Quaker's labeling was "factually accurate" and not misleading. *Id.*

Here too, the use of the Cocoa Life and Rainforest Alliance seals is not misleading, as those seals truthfully reflect MII's participation in those programs and receipt of certifications. Even if Plaintiff subjectively interpreted these seals to suggest that MII's supply chain is completely free of child labor or slave labor and had no negative effects on the environment, a manufacturer has no duty to "anticipate and affirmatively dispel . . . shoppers' idiosyncratic assumptions or wholly incorrect interpretations of its advertising." *Thomas v. Costco Wholesale Corp.*, 2022 WL 636637, at *2 (9th Cir. Mar. 4, 2022); *see Weiss v. Trader Joe's Co.*, No. 18-1130, 2018 WL 6340758, at *5 (C.D. Cal. Nov. 20, 2018), *aff'd*, 838 F. App'x 302 (9th Cir. 2021) (noting that "a reasonable consumer would not assume things about a product other than what the statement actually says") (citation, internal quotation marks, and alterations omitted).[5]

Moreover, even if one credited Plaintiff's allegation that a consumer *might* interpret these seals to suggest that the products are free of cocoa farmed using specific labor or environmental practices, that is not the only plausible interpretation of these seals. And because the message these seals communicate is (at worst) ambiguous, this Court must also consider whether "additional information other than the front label was available to consumers." *McGinity*, 69 F.4th at 1098; *see also Moore*, F.4th at 882 (affirming dismissal of false advertising lawsuit where "other available information" about the product "would quickly dissuade a reasonable consumer" from adopting the plaintiff's alleged interpretation of the label).

Although the Cocoa Life and Rainforest Alliance seals on the labeling truthfully reflect MII's commitment to addressing sector-wide labor and environmental issues, much more information about these programs is available online. Indeed, the labeling of the Gluten Free OREO cookies Plaintiff

---

[5] Plaintiff will likely rely on *Walker v. Nestle USA, Inc.*, in which another district court credited the plaintiff's allegation that Nestle's use of a third-party certification by UTZ (the predecessor of Rainforest Alliance) amplified the effect of other "advertising statements" about cocoa sourcing "by suggesting they are true because they were approved by a third party." No. 19-723, 2022 WL 901553, at *3 (S.D. Cal. Mar. 28, 2022). But that unreasoned, one-sentence finding is at odds with many other cases holding that third-party certifications are not misleading—either on their own or in combination with other labeling claims. *See Myers*, 2020 WL 13302437 at *4–5; *Herceg*, 2023 WL 6162939, at *6; *Jackson*, 2022 WL 4591749, at *4. No court has ever cited the district court's decision in *Walker* to hold that the use of a third-party certification is deceptive, and this Court should not be the first to do so.

NOTICE OF MOTION AND MOTION TO DISMISS; MEMORANDUM OF POINTS & AUTHORITIES
CASE NO. 3:24-CV-565-AMO

allegedly purchased specifically states: "For more information, visit cocoalife.org." RJN Ex. 8. And as courts faced with similar cases have noted, a plaintiff cannot plausibly allege that a seal (or any other labeling statement) is misleading when a consumer can ascertain its meaning by reviewing a website. *See, e.g.*, *Ehlers v. Ben & Jerry's Homemade Inc.*, No. 19-194, 2020 WL 2218858, at *7 (D. Vt. May 7, 2020) (dismissing lawsuit challenging Ben & Jerry's use of the 'Caring Dairy" seal on its products where the "Caring Dairy program . . . indisputably encourages the humane treatment of animals," the "Ben & Jerry's website discloses to consumers that participation in the program is voluntary," and neither the packaging nor the website "represent[ed] that Ben & Jerry's products are 'sourced exclusively' from Caring Dairy farms"); *Dwyer*, 598 F. Supp. 3d at 150 (dismissing lawsuit challenging claims about the products' environmental impact when the defendant's website "provide[d] consumers with details" regarding the calculation of environmental impact and "never indicat[ed] that it includes methane emissions from land occupation or eutrophication, or that it accounts for the entire life cycle of wool production").

Here too, the Cocoa Life and Rainforest Alliance websites make clear that these certifications do not promise a product that is made from cocoa beans farmed without any trace of allegedly harmful labor or farming practices. For example, the Cocoa Life website notes that the program reached 230,000 farmers by the end of 2022 and that 80% of the cocoa volumes for MII's chocolate brands were sourced through the Cocoa Life program. *See* RJN Ex. 1. It does not promise that all of the cocoa MII procures from its suppliers is farmed using specific farming methods or that the cocoa supply chain is completely free of child or slave labor; to the contrary, it expressly acknowledges that "change takes time" and describes the progress that MII has made toward its goals. *Id.* Similarly, the Rainforest Alliance website states that the seal "demonstrates that farmers and companies are *taking steps* to making their products *more* sustainable, creating a better future for people and nature." RJN Ex. 2 (emphasis added). Given that clarification, it is not remotely plausible that a reasonable consumer would share Plaintiffs' "specific, and fairly extreme, understanding of the logos" to imply that the cocoa MII buys from its third-party suppliers is farmed without any trace of problematic labor or environmental practices. *Garcia v. Sony Computer Entm't Am., LLC*, 859 F. Supp. 2d 1056, 1064 (N.D. Cal. 2012); *see also Myers*, 2020 WL 13302437, at *4 (holding that the defendants' use of these seals was "factually accurate" and reflected their commitment to "work[] to promote sustainable and ethical practices").

1        That is particularly true because the Cocoa Life and Rainforest Alliance certifications, by their

2  own terms, reflect aspirational goals.  For example, Plaintiff alleges that MII "states that its goal is to

3  purchase all its cocoa through this Cocoa Life program by 2030," but she does not—and cannot—allege

4  that this is not in fact MII's "goal." Compl. ¶ 19.  Similarly, while Plaintiff alleges that MII "makes false

5  assurances that its Cocoa Life program is seeking to 'accelerate positive impact and help drive sector

6  transformation' and that it is 'working to help prevent and combat the risk of child labor,'" she does not

7  plead any facts that suggest that the Cocoa Life program is not *trying* to achieve those aspirational

8  objectives.  *Id.* ¶ 20.  And while Plaintiff suggests that it is misleading for the Rainforest Alliance to

9  "claim[] to 'address' child labor," the only factual allegation supporting that conclusion is a single report

10  reflecting that some unspecified number of "Rainforest certified farms have been found to use child labor

11  despite the certification."  *Id.* ¶ 44.  That does not mean that Rainforest Alliance has done nothing to

12  "address" child labor or that its stated goals are an "empty promise," as Plaintiff claims.  *Id.*  And it

13  certainly does not mean that MII is responsible for the Rainforest Alliance's alleged failure to deliver on

14  its supposed "promise" to eradicate the use of child labor throughout the entire cocoa farming sector.

15        Many courts, including those faced with similar chocolate mislabeling lawsuits, have found that

16  aspirational statements akin to those on the labeling are not misleading as a matter of law.  *See, e.g.*,

17  *Barber v. Nestle USA, Inc.*, 154 F. Supp. 3d 954, 963–64 (C.D. Cal. 2015), *aff'd*, 730 F. App'x 464 (9th

18  Cir. 2018) (finding that statements in Nestlé's sourcing guidelines and supplier code regarding labor

19  practices were not misleading because they made clear that the stated "requirements represent an ideal,

20  and not necessarily a reality"); *Myers*, 2020 WL 13302437, at *4 (finding that representations associated

21  with "Cocoa Horizons" were not misleading because Quaker did "not promise a perfect solution" but

22  "[i]nstead, it uses aspirational language—'promotes,' 'aims,' and 'supports'—which acknowledges its

23  limited control over the supply chain"); *Ruiz v. Darigold, Inc./Nw. Dairy Ass'n*, No. 14-1283, 2014 WL

24  5599989, at *4 (W.D. Wash. Nov. 3, 2014) (dismissing CLRA and UCL claims challenging claims

25  regarding the defendant's treatment of its cows and employees because, "when read in context," these

26  statements "reflect nuanced assessments of the current situation, are aspirational statements, or have not

27  been shown to be false in any material respect"); *Nat'l Consumers League v. Wal-Mart Stores, Inc.*, No.

28  15-7731, 2016 WL 4080541, at *5–7 (D.C. Super. July 22, 2016) (dismissing lawsuit alleging that the

1  defendants "promised the consumers that their goods are manufactured free of child labor" because the

2  challenged statements were "aspirational," "general in nature," and simply "outline[d] the expectations of

3  each retailer and efforts by each retailer to place pressure on its suppliers to be more socially responsible").

4          Here too, the Cocoa Life and Rainforest Alliance seals do not guarantee that MII's supply chain is

5  free of objectionable labor and environmental practices.  To the contrary, those seals truthfully reflect

6  MII's commitment to the goals of the Cocoa Life and Rainforest Alliance programs.  Those seals are not

7  remotely misleading, and this Court should dismiss any claims premised on the use of these seals.

8  **III.    Absent Any Plausible Claim of Deception, Plaintiff's Ancillary Claims Also Fail.**

9          In addition to her claims under the CLRA and the "fraudulent" prong of the UCL, Plaintiff also

10  asserts claims under the "unlawful" and "unfair" prongs of the UCL and a claim for unjust enrichment.

11  *See generally* Compl. ¶¶ 90–116.  But absent any plausible allegation of deception, these claims also fail.

12          **A.    Plaintiff fails to state a plausible claim under the UCL's "unlawful" prong.**

13          The UCL's "unlawful" prong "incorporates other laws and treats violations of those laws as

14  unlawful business practices independently actionable under state law."  *Clark v. Countrywide Home*

15  *Loans, Inc.*, 732 F. Supp. 2d 1038, 1050 (E.D. Cal. 2010).  "[A] claim under this prong hinges upon

16  whether a plaintiff can formulate a claim under the predicate law."  *Eidmann v. Walgreen Co.*, 522 F.

17  Supp. 3d 634, 647 (N.D. Cal. 2021) (citation omitted).  "Thus, if the plaintiff cannot state a claim under

18  the predicate law . . . the UCL claim also fails."  *Id.* (citation, internal quotation marks, and alteration

19  omitted); *see also*, *e.g.*, *Warner v. Tinder Inc.*, 105 F. Supp. 3d 1083, 1095 (C.D. Cal. 2015) (holding that

20  the plaintiff's "UCL claim fails to the extent it is based on the unlawful prong of the statute because he

21  has not adequately alleged that Tinder engaged in any unlawful conduct").

22          Plaintiff identifies three predicates for her claim under the UCL's "unlawful" prong: (1) the CLRA;

23  (2) the Environmental Marketing Claims Act ("EMCA"), Cal. Bus. & Prof. Code §§ 17580 *et seq.*; and

24  (3) the Federal Trade Commission's "Green Guides," 16 C.F.R. §§ 260.1 *et seq.*  *See* Compl. ¶¶ 92–99.

25  With respect to the EMCA and the Green Guides, Plaintiff suggests that MII violates these provisions by:

26  (1) allegedly making "[u]nqualified general environmental benefit claims" in violation of 16 C.F.R.

27  § 260.4; (2) allegedly making "general environmental claims without noting specific benefits" in violation

28  of 16 C.F.R. § 260.3(a); and (3) including "endorsements" on the products that allegedly "appear to be

from third-party organizations" that are not actually "independent" and failing to disclose "any material connections with the manufacturer." Compl. ¶¶ 46–47, 49, 97. Plaintiff also alleges that the "use of the environmental and socially beneficial seals or certifications is in contravention of the FTC's Guides on Endorsements because Mondelez's Cocoa Life program does not exercise the expertise that consumers reasonably expect from experts in sustainable farming," as "[t]hese seals/certifications do not evaluate certified farms as extensively as an expert group on farm sustainability would." *Id.* ¶ 98.

As explained above, Plaintiff has not stated a claim under the CLRA—which means she cannot use an alleged violation of the CLRA as a predicate for a claim under the UCL's "unlawful" prong. *See supra* §§ I–II. Similarly, to the extent Plaintiff relies on the Green Guides and the EMCA as predicates for her claim under the "unlawful" prong, she cannot do so because the EMCA (which incorporates the Green Guides by reference) permits the use of environmental marketing claims, including claims regulated by the Green Guides, "provided only that they do not mislead reasonable consumers." *Hill*, 195 Cal. App. 4th at 1305. As explained above, Plaintiff has not plausibly alleged that any representations about "sustainability" are likely to mislead reasonable consumers. *See supra* § II.A. That is fatal not only to Plaintiff's claims of deception, but also to her claims under the "unlawful" prong.

Plaintiff's reliance on the Green Guides and the EMCA also fail because she has not plausibly alleged that the challenged labeling includes "general environmental benefit claims." As the Green Guides make clear, a "general environmental benefit claim" is one that "likely conveys that the product, package, or service has specific and far-reaching environmental benefits" or that "conveys that the item or service has no negative environmental impact." 16 C.F.R. § 260.4(b) & (d) (listing "Eco-Friendly" as an example of such a claim). Here, in contrast, the "sustainability" representations Plaintiff challenges—such as "100% Sustainably Sourced Cocoa" and "Through our partnership with Cocoa Life, we help support sustainable cocoa sourcing"—are not general environmental benefit claims.

These claims do not suggest that the products have "specific and far-reaching environmental benefits." *Id.* Nor do they suggest that those products have "no negative environmental impact." *Id.* Rather, as explained above, they are aspirational marketing claims that do not promise a product that is completely free of child labor and that has no negative effects whatsoever on the environment. *See, e.g.*, *Lizama v. H&M Hennes & Mauritz LP*, No. 22-1170, 2023 WL 3433957, at *8 (E.D. Mo. May 12, 2023)

1  (holding that clothing manufacturer did not make "general environmental benefit claims" when it stated

2  that its "Conscious Choice" clothing items were "made with 'a little extra consideration for the planet'

3  because they use 'more sustainable materials' than its regular collection").

4       Indeed, Plaintiff's use of the term "sustainable" to encompass concerns about labor practices

5  underscores why the FTC decided *not* to treat "sustainable" as a "general environmental benefit claim"

6  when it promulgated the Green Guides. *See* RJN Ex. 3, at 257–58. Even if there are "context[s]" in which

7  "reasonable consumers perceive a sustainable claim as a general environmental benefit claim" (*id.* at 258),

8  that would not salvage Plaintiff's claims of deception. That is because she has not plausibly alleged that

9  reasonable consumers would interpret "sustainable" as a claim about the products' environmental

10  impact—let alone as a "general environmental benefit claim" that suggests that the cocoa in the products

11  is farmed using methods that have absolutely no negative impact on the environment.

12       Plaintiff also alleges that MII violates the "unlawful" prong by violating provisions of the Green

13  Guides governing "endorsements." *See* Compl. ¶¶ 97–98. But the relevant provision of the Green Guides,

14  16 C.F.R. § 260.6(a), simply prohibits manufacturers from "misrepresent[ing], directly or by implication,

15  that a product, package, or service has been endorsed or certified by an independent third party." Here,

16  MII does not represent that Cocoa Life is an "independent third party"; to the contrary, its labeling includes

17  a link to the Cocoa Life website, which makes clear that Cocoa Life is an MII-sponsored initiative. *See*

18  Compl. ¶ 62 & RJN Ex. 8 (labeling of Gluten Free OREO cookies including link to Cocoa Life website);

19  RJN Ex. 1 (Cocoa Life website). And to the extent Plaintiff claims that the use of the Cocoa Life seal

20  violates the Green Guides because the "Cocoa Life program does not exercise the expertise that consumers

21  reasonably expect from experts in sustainable farming" (Compl. ¶ 98), that claim fails because the labeling

22  does not represent—either expressly or implicitly—that Cocoa Life is an "expert" organization. And to

23  the extent this claim is premised on the Rainforest Alliance certification, it similarly fails because Plaintiff

24  has not alleged (and cannot plausibly allege) that the Rainforest Alliance is not an "independent third

25  party" or that it has not permitted the use of its seal. None of the labeling implicates (let alone *violates*)

26  the FTC's regulations governing third-party endorsements. Those regulations accordingly cannot serve

27  as a predicate for a claim under the "unlawful" prong.

28

### B. Plaintiff fails to state a plausible claim under the UCL's "unfair" prong.

Where "unfair prong claims overlap entirely with . . . claims of fraud," the "unfair prong claim cannot survive" absent a plausible claim of deception. *Ahern*, 411 F. Supp. 3d at 561 (citation and internal quotation marks omitted). Here, Plaintiff's claim under the UCL's "unfair" prong is premised on her allegation that she "would not have purchased" or would not have paid an "excessive premium price" for the products "absent Mondelez's unlawful, fraudulent, and unfair marketing, advertising, packaging, and labeling." Compl. ¶ 103. Since that theory of unfairness "overlaps entirely" with Plaintiff's claims of deception, her inability to allege that the labeling is deceptive also defeats her claim under the UCL's "unfair" prong. *Punian v. Gillette Co.*, No. 14-5028, 2016 WL 1029607, at *17 (N.D. Cal. Mar. 15, 2016).

### C. Plaintiff fails to state a plausible claim for unjust enrichment.

Plaintiff's unjust enrichment claim hinges on her allegation that MII "falsely and misleadingly represented through its labeling, advertising and marketing materials that its products are sustainable." Compl. ¶ 113. But as courts have made clear, Plaintiff's "failure to identify . . . actionable deception in the context of the 'reasonable consumer' test also requires the dismissal of her unjust enrichment claim." *Gudgel v. Clorox Co.*, 514 F. Supp. 3d 1177, 1188 (N.D. Cal. 2021). *also, e.g.*, *Walcoff v. Innofoods USA, Inc.*, No. 22-1485, 2023 WL 3262940, at *9 & n.12 (S.D. Cal. May 4, 2023) (dismissing unjust enrichment claim where plaintiff had "not pleaded any plausible claims based on misrepresentations" under the UCL and CLRA). Because Plaintiff has not plausibly alleged that the two products she purchased contain cocoa harvested through "unsustainable" means and has not plausibly alleged that the labeling of those products is likely to mislead reasonable consumers, her claim for unjust enrichment necessarily fails.

The unjust enrichment claim also fails because "California does not recognize a separate cause of action for unjust enrichment." *Abuelhawa v. Santa Clara Univ.*, 529 F. Supp. 3d 1059, 1070 (N.D. Cal. 2021) (citation omitted); *see also, e.g.*, *Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110, 132–33 (N.D. Cal. 2020) (collecting cases); *De Havilland v. FX Networks, LLC*, 21 Cal. App. 5th 845, 870 (2018) ("Unjust enrichment is not a cause of action.") (citation omitted). For that reason, "courts have consistently dismissed stand-alone claims for unjust enrichment." *Brodsky*, 445 F. Supp. 3d at 132. Whether or not this Court permits Plaintiff's other claims to proceed, it should dismiss her unjust enrichment claim.

1  **IV.    Plaintiff Lacks Standing to Challenge Advertising She Did Not See or Rely On.**

2          "To demonstrate standing" in a product mislabeling case, a plaintiff must establish that her alleged

3  "injury is causally linked" to the alleged misrepresentations. *In re iPhone Application Litig.*, 6 F. Supp.

4  3d 1004, 1015 (N.D. Cal. 2013); *see also Spokeo, Inc. v. Robins*, 578 U.S. 330, 338–39 (2016) (noting

5  that a plaintiff must allege that her injuries are "fairly traceable to the challenged conduct of the defendant"

6  to establish Article III standing). It is axiomatic that "reliance is the causal mechanism of fraud." *Kwikset

7  Corp. v. Superior Court*, 51 Cal. 4th 310, 326 (2011) (citation and internal quotation marks omitted). For

8  that reason, courts routinely hold that a plaintiff "does not have standing to challenge statements or

9  advertisements that she never saw." *Ham v. Hain Celestial Grp., Inc.*, 70 F. Supp. 3d 1188, 1197 (N.D.

10  Cal. 2014); *see also, e.g.*, *Pappas*, 2016 WL 11703770, at *6 (dismissing claims premised on statements

11  other than "non-GMO" where the plaintiff did "not adequately plead that she saw or relied on any other

12  representations" in deciding to purchase Chipotle's products).

13          In a similar vein, courts have also held that plaintiffs do "not have Article III standing to challenge

14  advertisements on products [they] did not buy." *McCracken v. KSF Acquisition Corp.*, No. 22-1666, 2022

15  WL 18932849, at *2 (C.D. Cal. Dec. 15, 2022); *see also, e.g.*, *Granfield v. NVIDIA Corp.*, No. 11-5403,

16  2012 WL 2847575, at *6 (N.D. Cal. July 11, 2012) ("[S]ince Plaintiff does not allege any injury stemming

17  from the purchase or use of these other models, Plaintiff lacks standing to assert claims based on alleged

18  defects in them."). The reason is simple: while a "plaintiff who is falsely led to buy a product may claim

19  injury resulting from that purchase," the "same plaintiff . . . cannot claim injury from similarly false

20  advertising upon which he or she did not injuriously rely (by buying a similar product or otherwise)."

21  *Lorentzen v. Kroger Co.*, 532 F. Supp. 3d 901, 909 (C.D. Cal. 2021).

22          Here, Plaintiff only identifies two products she allegedly purchased—Gluten Free OREO cookies

23  and Toblerone chocolate bars. *See* Compl. ¶ 62. But her complaint nonetheless alleges that MII "markets

24  *many* of its products as 'sustainable'" and seeks to hold MII liable for the labeling of those products as

25  well. *Id.* ¶ 41 (emphasis added); *see also id.* ¶ 1 (noting that MII's chocolate products "include Oreos,

26  Chips Ahoy!, Clif Bars, and Toblerone"); *id.* ¶ 43 (challenging the use of the Rainforest Alliance seal on

27  Clif Bars). Plaintiff similarly challenges representations in a host of other sources—such as MII's

28  Employee Code of Conduct, its Supplier Code of Conduct, and various websites—that she does not allege

that she saw or relied on when she decided to buy Gluten Free OREO cookies and Toblerone bars. *See, e.g.*, *id.* ¶ 11 & n.7 (citing MII's Employee Code of Conduct); *id.* ¶ 20 & n.17 (citing MII's International Supplier & Partner Code of Conduct); *id.* ¶ 20 n.16 (citing the Cocoa Life website as evidence that MII "makes false assurances" about its Cocoa Life program). Absent any allegation that Plaintiff saw or relied on those sources when she purchased Toblerone chocolate bars or Gluten Free OREO cookies, she cannot establish that her purported injuries were "causally linked" or "traceable" to these sources.

Plaintiff cannot sidestep this result by alleging that she purchased unspecified "chocolate/cocoa products, including but not limited to Gluten Free Oreos and Toblerone bars," that contained "other false sustainability claims." Compl. ¶ 62. That allegation is woefully insufficient to satisfy Rule 9(b), as it does not identify which other products she purchased—let alone "what is false or misleading" about their labeling and "why it is false." *Cafasso*, 637 F.3d at 1054–55 (citation omitted); *see also, e.g.*, *Tabler v. Panera LLC*, No. 19-1646, 2019 WL 5579529, at *11 (N.D. Cal. Oct. 29, 2019) (dismissing claims premised on the plaintiff's purchased of "unspecified 'bread products'" from Panera, finding that the plaintiff's allegations "do not satisfy the heightened pleading standard of Rule 9(b)," and noting that the plaintiff's "failure to specify which Products she purchased compounds the uncertainty"). Because Plaintiff has not even *tried* to identify the other products she purchased (let alone what statements allegedly appeared on those products), she cannot plausibly allege that the labeling of those products injured her. This Court should therefore dismiss Plaintiff's claims to the extent they are premised on products she does not specifically allege that she purchased and materials she does not specifically allege that she reviewed.

## V. Plaintiff Cannot Assert Her Claims on Behalf of a Nationwide Class.

Plaintiff's lawsuit is also overbroad in another critical respect: even though she is a resident of California and asserts claims under California law, she asserts all of her claims on behalf of a putative nationwide class. *See* Compl. ¶ 65. Regardless of whether this Court allows Plaintiff's lawsuit to proceed (which it should not), it should dismiss Plaintiff's nationwide class claims for at least two separate reasons:

First, because the elements of a consumer fraud claim or a claim for unjust enrichment "vary materially from state to state," the Ninth Circuit has held that these claims are unsuited to resolution on a nationwide basis. *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 591 (9th Cir. 2012). The same is true of Plaintiff's claims under the UCL and CLRA, as there are "material differences" in the elements of each

1    state's consumer protection statutes and the remedies available under those statutes.  *Id.*; *see also Davison*

2    *v. Kia Motors Am., Inc.*, No. 15-239, 2015 WL 3970502, at *2 (C.D. Cal. June 29, 2015) (collecting cases).

3         Moreover, "the principle articulated in *Mazza* applies generally and applies even when addressing

4    a motion to dismiss."  *Frezza v. Google Inc.*, No. 12-237, 2013 WL 1736788, at *6 (N.D. Cal. Apr. 22,

5    2013) (dismissing UCL and breach of contract claims asserted on behalf of putative nationwide class); *see*

6    *also, e.g.*, *Hageman v. Hyundai Motor Am.*, No. 23-1045, 2024 WL 694378, at *3 (C.D. Cal. Jan. 5, 2024)

7    (dismissing unjust enrichment claim asserted on behalf of putative nationwide class); *Pistacchio v. Apple*

8    *Inc.*, No. 20-7034, 2021 WL 949422, at *3 (N.D. Cal. Mar. 11, 2021) (similar).  Here too, it is impossible

9    to adjudicate Plaintiff's claims on behalf of a nationwide class, as it would require the Court to apply the

10   varying laws of all fifty states.  The Court should therefore dismiss Plaintiff's nationwide class claims.

11        Second, as a matter of California substantive law, Plaintiff cannot assert claims under the UCL or

12   CLRA on behalf of consumers outside of California because these statutes do not apply extraterritorially.

13   California law recognizes a "presumption" that the Legislature "did not intend to give its statutes any

14   extraterritorial effect."  *N. Alaska Salmon Co. v. Pillsbury*, 174 Cal. 1, 4 (1916).  Because "[n]either the

15   language of the UCL nor its legislative history provides any basis for concluding the Legislature intended

16   the UCL to operate extraterritorially," the "presumption against extraterritoriality applies to the UCL in

17   full force."  *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1207 (2011); *see also, e.g.*, *Figy v. Frito-Lay N.*

18   *Am., Inc.*, 67 F. Supp. 3d 1075, 1086 (N.D. Cal. 2014) (noting that "the ordinary presumption against

19   extraterritorial application of California law applies to" UCL and CLRA claims); *Warner*, 105 F. Supp.

20   3d at 1096 (noting that "California does not permit extraterritorial application" of the UCL or CLRA).

21        *Wilson v. Frito-Lay North America, Inc.*, 961 F. Supp. 2d 1134 (N.D. Cal. 2013), is illustrative.

22   There, the court rejected the plaintiffs' effort to "expand their case to include a nationwide putative class

23   of consumers" and agreed that "such claims must fail[] because Plaintiffs sue[d] only based on violations

24   of California law, and the Supreme Court of California ha[d] clarified that . . . the UCL . . . and CLRA

25   presumptively do not apply to occurrences outside of California."  *Id.* at 1147.  In so holding, the court

26   agreed that "Plaintiffs ha[d] failed to give a plausible account of how or why a non-California plaintiff

27   could sue under California tort law for purchases made outside the state from a Texan company that, at

28   most, advertises and sells its products in California."  *Id.* at 1148.  Because "there [was] no plausible way

1  for a non-California citizen who purchased Defendant's Products outside California to bring these claims,"

2  the court dismissed any "California law claims based on activity occurring in other states." *Id.*

3  The same is true here. Whether or not Plaintiff can invoke California's consumer protection

4  statutes to sue on her own behalf or on behalf of other California consumers, she cannot sue MII—which

5  is not a California citizen—on behalf of consumers who reside outside of California, did not purchase the

6  products at issue in California, and whose alleged injuries have no nexus to the state of California. This

7  Court should not allow Plaintiff to assert these claims on behalf of a nationwide class.

8  **VI. Plaintiff Lacks Standing to Seek Injunctive Relief.**

9  Article III requires Plaintiff to "demonstrate standing for each claim that [she] press[es] and for

10  each form of relief that [she] seek[s] (for example, injunctive relief and damages)." *TransUnion LLC v.*

11  *Ramirez*, 594 U.S. 413, 431 (2021). To have standing to seek injunctive relief, a plaintiff must show "a

12  sufficient likelihood that he will again be wronged in a similar way." *City of Los Angeles v. Lyons*, 461

13  U.S. 95, 111 (1983). The threat of injury "must be actual and imminent, not conjectural or hypothetical."

14  *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). Here, Plaintiff seeks an order enjoining MII

15  from "making statements representing that products derived from Mondelez and Cocoa Life program

16  and/or third-party certified farms support sustainable farming or provide other general environmental and

17  social benefits." Prayer for Relief ¶ 54. But Plaintiff lacks Article III standing to seek that injunction, as

18  her allegations foreclose any plausible claim that she will purchase the products again absent a change in

19  its cocoa sourcing practices—regardless of whether their labeling represents that they are "sustainable."

20  "Although 'a previously deceived consumer may have standing to seek an injunction,' even if the

21  consumer now knows of the fraudulent practices, the consumer still must allege an actual threat of future

22  harm." *Ketayi v. Health Enrollment Grp.*, No. 20-1198, 2021 WL 2864481, at *8 (S.D. Cal. July 8, 2021)

23  (quoting *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 969–71 (9th Cir. 2018)). Here, Plaintiff's

24  allegations foreclose any risk of future harm, as they make clear that Plaintiff will purchase the products

25  in the future only if they are produced with absolutely zero traces of child or slave labor in the supply

26  chain. *See* Compl. ¶ 10 (alleging that the products are not "produced as advertised" due to the alleged use

27  of child and/or slave labor); *see id.* ¶ 64 (alleging that Plaintiff "would not have bought" the products "had

28  she known the products were not sourced from sustainable farming practices but rather off the backs of

child and slave labor"). Even if the injunction Plaintiff seeks would force MDLZ (or MII) to change the *labeling*, it would not force MII to change its *cocoa sourcing practices*. And because Plaintiff has not plausibly alleged that she will buy the products in the future absent a change in those sourcing practices, she faces no actual, imminent threat of future harm and cannot seek an injunction.

Indeed, many "district courts have found fatal the allegation that a plaintiff would purchase the defendant's product in the future if the product was reformulated because a court cannot impose a mandatory injunction requiring a company to alter its products." *Renn v. Otay Lakes Brewery, LLC*, No. 23-1139, 2024 WL 331616, at *8 (S.D. Cal. Jan. 29, 2024) (collecting cases). For example, in *Sinatro v. Barilla America, Inc.*, the plaintiffs sought to enjoin Barilla from labeling its pasta, which Barilla manufactured in the United States, as "ITALY'S #1 BRAND OF PASTA." 635 F. Supp. 3d 858, 865, 873–74 (N.D. Cal. 2022). The court held that the plaintiffs lacked standing to see injunctive relief, as they could not "reasonably claim that they will be deceived by the challenged representations now that they know where the products are manufactured." *Id.* at 875. In so holding, the court distinguished the case "from those challenging representations about product formulations or characteristics like 'natural' and 'naturally derived' or 'flushable' where the plaintiffs alleged that they could not rely on the defendant's representations in the future." *Id.* And even if the plaintiffs "remain interested in purchasing the products if . . . Barilla starts producing the pasta products in Italy instead of in the United States," the court found that "[t]his allegation holds no water because it is implausible to expect such facts to come to pass." *Id.*

Here, as in *Renn* and *Sinatro*, Plaintiff's willingness to purchase the products again does not depend on how they are labeled. Instead, it depends on whether MII can source cocoa in a manner that does not involve any trace of child or slave labor and that has no negative repercussions whatsoever on the environment. Whether or not that is hypothetically possible, that is not relief that this Court—or any court—can provide. Plaintiff's allegation that she will not purchase the products absent widespread changes in its cocoa sourcing practices deprives her of standing to seek injunctive relief.

## **CONCLUSION**

This Court should dismiss Plaintiff's lawsuit with prejudice and without leave to amend.

Dated:    April 1, 2024                          JENNER & BLOCK LLP

                                    By:    _____
                                                        /s/   Dean N. Panos
                                                           Dean N. Panos

                                           Attorneys for Defendant
                                           Mondelēz International, Inc.